UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :

COÖPERATIEVE CENTRALE RAIFFEISEN-    :
BOERENLEENBANK, B.A.,                 :
                     Plaintiff,    :    08 Civ. 9565 (DLC)
                                            :
             -v-               :    OPINION AND ORDER
                                            :

BROOKVILLE CDO I LTD. and WELLS FARGO  :
BANK, N.A., as trustee,            :
                    Defendants.  :
                                            :
----------------------------------------X

Appearances:

For Plaintiff
Michael B. Carlinsky
Jonathan E. Pickhardt
Judd R. Spray
Jordan Fletcher
Quinn Emmanuel Urquhart Oliver & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010

For Defendant Wells Fargo Bank, N.A.
Kevin J. Walsh
Locke Lord Bissell & Liddell LLP
885 Third Avenue, 26th Floor
New York, NY 10022-4802

DENISE COTE, District Judge:

    The plaintiff in this action does not want to terminate its participation in this commercial endeavor prematurely and thereby risk a claim that it has breached its contractual obligations. As a result, it seeks a declaration that events triggering its right to terminate have already occurred. In the

meantime, it has brought a motion for a preliminary injunction to prevent a distribution of proceeds to the other participants in the endeavor until it has had an opportunity to obtain both a declaration that it may terminate its participation in the endeavor and then a multi-million dollar payment it contends is now due upon the proper exercise of its termination rights.

Coöperatieve Centrale Raiffeisen-Boerenleenbank, B.A. ("Rabobank") filed this action on November 6, 2008, for a declaratory judgment and permanent injunction.  This Opinion and Order addresses its motion for a preliminary injunction filed on November 13, 2008 against Brookville CDO I Ltd. ("Brookville") and its trustee Wells Fargo Bank, N.A. ("Wells Fargo") to prevent the monthly distribution of certain funds set to occur on December 10, 2008.[1]  The motion was fully submitted on December 1.

---

[1] On December 1, 2008, a stipulation was filed by the parties addressing Brookville's status in this action.  The stipulation provides inter alia that Brookville 1) consents to jurisdiction; 2) does not intend to appear in this action; 3) confirms that Wells Fargo as trustee is authorized to exercise all of Brookville's rights and powers under the pertinent agreements, and 4) affirms that any order or judgment issued by the Court that is binding as to Wells Fargo will be binding as to Brookville, subject to Brookville's rights of appeal.  The parties agree that Wells Fargo will not assert that Brookville's failure to appear deprives this Court of jurisdiction over the preliminary injunction motion or of the power to issue a judgment for the relief requested in the Complaint, and Rabobank will not seek to have a default judgment entered against Brookville or seek sanctions for its failure to appear.

At a December 1 conference with the Court, the hearing on plaintiff's preliminary injunction motion was set for December 8, 2008.  With the parties' agreement, the affidavits submitted by the parties' witnesses with the motion papers constitute the direct testimony of the witnesses.  On December 5, the parties agreed to waive cross-examination of the witnesses and to rely solely on the witness affidavits and documentary evidence that had been submitted to the Court.  On December 8, the parties presented their oral arguments on the motion.

The plaintiff's sole witness is Sara C. Lee, the Managing Director and Head of U.S. Origination and Sales at Rabobank New York Branch.  The defendants' witnesses are Steven H. Kasoff, a Senior Portfolio Manager of Elliott Management Corporation ("Elliott Management"), and Carol Tracey Gibson, a Vice President in the Asset Securitization Group of Wells Fargo.

On December 9, and Order informed the parties that the motion for a preliminary injunction was denied.  The following constitutes this Court's findings of fact, set forth principally but not exclusively in the section titled Findings of Fact, and conclusions of law in support of that Order.

3

FINDINGS OF FACT

Formation and Purpose of Brookville

Merrill Lynch & Co. ("Merrill Lynch") formed Brookville in 2007 under the laws of the Cayman Islands as a special purpose vehicle known as a collateralized debt obligation or CDO. Brookville issues notes ("Notes") secured by pools of collateralized debt securities.  The Notes are structured in layers or tranches that correspond to the noteholders' rights to receive payment.  The cash flow generated by the collateral repays the noteholders, provides a return to equity holders, and pays fees related to its business.

Brookville makes its distributions once a month on the 10th day of the month or the next business day.  Wells Fargo oversees this distribution by following a Priority of Payments provision or "waterfall" in the Indenture which established Brookville. Where there is a default on payments on the debt obligations which constitute the collateral, the waterfall provision determines which parties bear the impact of the shortfall. There are actually three waterfall provisions, one each for interest proceeds, principal proceeds and liquidation proceeds.

The portfolio manager for the collateral ("Collateral Manager") may sell individual debt securities in the portfolio "at any time" it determines that the security has become a Credit Risk Security, as defined in the Indenture and its

associated documents.  Section 12.1 of the Terms Supplement to the Indenture provides that "the Issuer will not sell or otherwise dispose of any Collateral Debt Security; <u>provided</u> that the Issuer (upon the direction of the Collateral Manager to the Issuer and the Trustee)" may sell inter alia any "Defaulted Security" or "Credit Risk Security."  This allows Brookville to obtain the best price for its collateral.

At the time Brookville was created, it entered into a Hedge Agreement with Rabobank to provide Brookville with a hedge against a change in interest rates.  Rabobank is a banking association headquartered in The Netherlands.  Rabobank also provided $8,551,000 that Brookville used to pay its initial expenses and to invest in its collateral.[2]  The Hedge Agreement gives Rabobank a right to monthly payments from Brookville. Those payments are secured by Brookville's asset portfolio and cash flows.  Under each of the three waterfalls, Rabobank ranks fourth in order of priority, but is senior to every tranche of

---

[2] Rabobank characterizes the $8.5 million payment as a loan, while Wells Fargo emphasizes that Rabobank entered into an interest rate swap with Brookville in which payments to Rabobank depend on whether the fixed rate of interest paid by Brookville was higher than the floating rate paid by Rabobank.  Wells Fargo explains that the $8.5 million payment was required because the fixed rate paid by Brookville was higher than the then floating rate payable by Rabobank.  While the current interest rate entitles Rabobank to a termination payment, if interest rates move against Rabobank the amount of any payment will be reduced or Rabobank could owe Brookville a termination payment.

Brookville noteholders.  In the event Rabobank terminates the Hedge Agreement, it is entitled to a termination payment.

Rabobank's right to terminate the Hedge Agreement is contractually defined, and includes the right to terminate in the event of a defined default under the Indenture, followed by the acceleration of the Notes and the liquidation of any or all of the collateral.  To terminate the Hedge Agreement, Rabobank must provide written notice of the termination and identify a date for the termination that is no later than twenty days from the notice or earlier than the day following the notice.

Contract Language

There are several documents that govern Brookeville's creation and operation.  An Indenture and accompanying Terms Supplement were executed on April 26, 2007 among Brookville, a related entity, and Brookville's trustee Wells Fargo.  There is also the Hedge Agreement of the same date between Rabobank and Brookville, which consists of a Master Agreement, its Schedule, and a Confirmation.  The Indenture refers to Rabobank as the Hedge Counterparty and as a third-party beneficiary.  The parties' arguments on this motion concentrate on two contractual provisions:  one from the Terms Supplement to the Indenture which is entitled "Preservation of Collateral," and another from

the Schedule to the Hedge Agreement which defines the

"Additional Termination Event."

The relevant provision from the Indenture's Terms

Supplement, Section 5.5(a), provides:

Section 5.5 – **Preservation of Collateral**

(a)  If an Event of Default shall have occurred
and be continuing when any Class of Notes is
Outstanding (or the Commitment Period Termination
Date has not occurred), the Trustee shall not
terminate any Hedge Agreement (unless the Issuer
shall have entered into a replacement Hedge Agreement
for a terminated Hedge Agreement pursuant to Section
16.1 hereof) and shall retain the Collateral securing
the Notes intact, collect and cause the collection of
the proceeds thereof and make and apply payments and
deposits and maintain all accounts in respect of the
Collateral and the Notes in accordance with the
Priority of Payments and the provisions of Articles
X, XII, and XIII unless the Notes have been declared
immediately due and payable (and such declaration and
its consequences have not been rescinded and
annulled) and any of the following conditions are
met:

(i) in the case of an Event of Default (other
than as specified in clause (a)(i) of the
definition thereof with respect to the Class A-1
Notes):  (A) the Trustee determines that the
anticipated proceeds of a sale or liquidation of
the Collateral (after deducting the reasonable
expenses of such sale or liquidation) would be
sufficient to discharge in full the amounts then
due and unpaid on the Notes for principal and
interest (including the Deferred Interest
Amounts, Defaulted Interest and interest on
Defaulted Interest) and Commitment Fee and due
and unpaid Administrative Expenses, and any
accrued and unpaid amounts payable by the Issuer
pursuant to each Hedge Agreement, including
termination payments, if any (assuming, for this
purpose, that each Hedge Agreement has been
terminated by reason of the occurrence of an

event of default or termination event with respect to the Issuer) in accordance with the Priority of Payments; <u>or (B) a Special Majority of each Class of Notes voting</u> as a separate Class and each Hedge Counterparty (unless no termination payment, including any accrued and unpaid amounts, would be owing by the Issuer to such Hedge Counterparty upon the termination thereof by reason of the occurrence of an event of default under any Hedge Agreement with respect to the Issuer), subject to the provisions of this Indenture, <u>direct the sale and liquidation of the Collateral</u>;

(ii) <u>the Holders of at least 66 2/3% in Aggregate Outstanding Amount of each Class of Notes, voting</u> as a separate Class and each Hedge Counterparty (unless no early termination payment, including any accrued and unpaid amounts, would be owing by the Issuer to such Hedge Counterparty upon the termination thereof by reason of an event of default or termination event under the relevant Hedge Agreement with respect to the Issuer), subject to the provisions hereof, <u>direct the sale and liquidation of the Collateral</u>;

(iii) <u>a Majority of each Class of Notes (voting as a separate Class) direct the sale and liquidation of the Collateral</u> if (A) an Event of Default has occurred and is continuing pursuant to Section 5.1(a) in respect of the Class A-1 Notes or (B) an Event of Default has occurred and is continuing pursuant to Sections 5.1(j) or (k.)

The Trustee shall give written notice of the retention of the Collateral to the Issuer with a copy to the Co-Issuer, the Hedge Counterparties, the Collateral Manager and the Holders of the Notes of the Controlling Class.  So long as such Event of Default is continuing, any such retention pursuant to this Section may be rescinded at any time when any of the conditions specified above exists.

<u>If any one of the applicable conditions above to the liquidation of the Collateral is satisfied, the</u>

Trustee will liquidate the Collateral and, on the
sixth Business Day (the "**Accelerated Maturity Date**")
following the Business Day (which shall be the
Determination Date for such Accelerated Maturity
Date) on which the Trustee notifies the Issuer, the
Collateral Manager, each Hedge Counterparty and each
Rating Agency that such liquidation has been
completed, apply the proceeds of such liquidation in
accordance with the Liquidation Waterfall.
Notwithstanding the foregoing, in no event shall any
application of the proceeds of any sale or
liquidation of the Collateral following an Event of
Default occur prior to the earlier of (x) the sixth
Business Day after the date on which any of the
conditions set forth above is satisfied and (y) the
date on which amounts (if any) payable by the Issuer
to any Hedge Counterparty [Rabobank] due to an "Early
Termination Event" (as defined in the relevant Hedge
Agreement) become due and payable.

(Emphasis supplied.)

Section 5(e) of the Schedule to the Hedge Agreement, titled

"Additional Termination Events," provides:

> **Event of Default under Indenture.**  The
> occurrence of an Event of Default under the Indenture
> followed by the acceleration of the Notes and the
> liquidation of any or all of the collateral.  Such
> Additional Termination Event shall occur on the date
> on which the liquidation of the collateral is
> commenced.

Section 5(e)(ii)(1) (emphasis supplied.)


Financial Deterioration of Brookville

Most of Brookville's collateral is either distressed bonds,

many of which were originally rated as BBB, and which are now

close to worthless, or well-performing bonds that are currently

rated AAA or AA.  While Brookville owns some of the bonds

9

directly, it owns others as synthetic assets pursuant to
derivative agreements.  Under those agreements Brookville bears
essentially the same risk as if it owned the bonds directly.  As
of November 2008, the par value of Brookville's collateral was
roughly $329 million, but the market value of those debt
securities had diminished substantially.[3]

On February 19, 2008, Wells Fargo issued a notice that an
Event of Default had occurred under Brookville's Indenture.  On
March 4, it issued a notice that Brookville's Notes had been
accelerated.  In each of the months that followed, Wells Fargo
continued to make the monthly payments required by the waterfall
provisions of the governing documents.

In June, Elliott International, L.P. and The Liverpool
Limited Partnership (the "Elliott Funds") acquired the senior-
most tranche of Brookville's Notes (known as the "Class A-1
Notes" or the "Controlling Class" Notes under the Indenture)
from Merrill Lynch.  After the Elliott Funds purchased these
Notes, it reviewed Brookville's portfolio and concluded that
"many" of the securities in the portfolio could be classified as
either Defaulted Securities or Credit Risk Securities and sold
pursuant to Section 12.1 of the Terms Supplement to the
Indenture.  In August, several of the synthetic bonds held as

---

[3]   Rabobank has provided hearsay evidence that the market value
of Brookville's portfolio as of the end of October was
approximately $30 million.

part of Brookville's collateral were reclassified by
Brookville's Collateral Manager Petra Capital Management LLC
("Petra Capital") and sold to the Elliott Funds pursuant to
Section 12.1.  These sales were reflected in an August Note
Valuation Report issued by Wells Fargo.

On October 27, Wells Fargo issued a notice that Petra
Capital had been removed as Collateral Manager at the direction
of the Elliott Funds[4] and the holders of Brookville's preference
shares.[5]  On October 29, Wells Fargo issued a notice that Dynamic
Credit Partners, LLC ("Dynamic Credit") had been chosen by the
Elliott Funds to be the new Collateral Manager.  As of today, no
vote to liquidate by any of the groups described in Sections
5.5(a)(i),(ii), and (iii) of the Terms Supplement to the
Indenture has been taken and no direction to liquidate as a
result of such a vote has been given to Wells Fargo.

Rabobank contends that, where there has been an Event of
Default and an acceleration of the Notes, any reclassification
of Brookville's collateral as Credit Risk Securities and sale of
those reclassified securities constitutes a liquidation and
deprives Rabobank of its rights to advance notice of a

---

[4] The notice refers to the Controlling Class noteholder, which is
the Elliott Funds.

[5] Rabobank has provided hearsay evidence that the Elliott Funds
directed Petra Capital to reclassify all of Brookville's
collateral as credit risks, but that Petra Capital refused.

liquidation, the right to terminate the Hedge Agreement in advance of liquidation, and priority in repayment at liquidation.  Without an opportunity to terminate the Hedge Agreement upon a liquidation of the collateral, it will be relegated to receiving simply those proceeds normally distributed each month under the waterfall protocols.  If Rabobank terminated the Hedge Agreement now it estimates that it would be entitled to a termination payment of roughly $9.5 million.

On October 20, Rabobank contacted Wells Fargo to indicate its intent to terminate the Hedge Agreement, contending that its right to terminate had been triggered by the sale of certain collateral in August.  Through a series of conversations that followed, Wells Fargo took the position that the August 2008 sales of collateral did not constitute a liquidation and therefore did not trigger Rabobank's right to terminate the Hedge Agreement, and that any effort to terminate prematurely would be a breach of the Hedge Agreement and invalidate Rabobank's priority distribution rights.   Wells Fargo refused to notify Rabobank in advance of sales of collateral pursuant to Section 12.1 of the Terms Supplement to the Indenture, asserting that Section 12.1 sales are not a liquidation as that term is defined in Section 5.5(a) of the Terms Supplement.  Nonetheless, Rabobank was told on November 4 that on the day before at least

12

$30 million (par value) of Brookville's assets were auctioned,
with the proceeds expected to be available for distribution on
December 10.  A November 10 Note Valuation Report indicates that
those sales yielded $3.685 million.


CONCLUSIONS OF LAW

     Wells Fargo argues that Rabobank has a right to terminate
the Hedge Agreement in the event of a default, an acceleration
of the Notes, and the liquidation of the collateral, and admits
that the first two of those three conditions has occurred.  It
argues, however, that the liquidation of collateral is an event
governed by Section 5 of the Terms Supplement and requires a
direction to the Trustee to liquidate, which has not been given.
Rabobank insists that the liquidation has occurred, triggering
its right to terminate the Hedge Agreement and receive a
termination payment, and that Wells Fargo must hold the proceeds
from any sales of the collateral until Rabobank exercises its
right to terminate the Hedge Agreement and obtains its
termination payment.  Rabobank seeks a preliminary injunction
enjoining the defendants

          from distributing the proceeds of any sale or
          liquidation of Brookville's assets, including any
          sale pursuant to Section 12.1 of the Terms
          Supplement, in contravention of Rabobank's repayment
          priority, and, in any event, not until the
          conditions set forth in Section 5.5 of the Terms
          Supplement have been satisfied or the Hedge

Agreement is terminated and the termination payment becomes due and payable.

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (quoting 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 2948 (2d ed. 1995)).  To obtain a preliminary injunction, a party must ordinarily show "(1) a likelihood of irreparable harm in the absence of the injunction; and (2) either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in the movant's favor." Doninger v. Niehoff, 527 F.3d 41, 47 (2d Cir. 2008).

Wells Fargo contends that the relief Rabobank requests through this preliminary injunction, however, requires it to meet the more demanding standard that applies when a party seeks a mandatory injunction.  "[A]n injunction altering, rather than maintaining, the status quo, . . . must meet the more rigorous standard of demonstrating a clear or substantial showing of a likelihood of success on the merits." Almontaser v. New York City Dep't of Educ., 519 F.3d 505, 508 (2d Cir. 2008) (citation omitted); see also Sunward Electronics, Inc. v. McDonald, 362

F.3d 17, 24 (2d Cir. 2004) (the "party seeking the injunction must show a clear or substantial likelihood of success where the injunction sought is mandatory -- i.e., it will alter, rather than maintain, the status quo" (citation omitted)).[6]

"The distinction between mandatory and prohibitory injunctions is not without ambiguities or critics." Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 114 (2d Cir. 2006) (quoting Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 34 (2d Cir. 1995)).

> A preliminary injunction is usually prohibitory and seeks generally only to maintain the status quo pending a trial on the merits.  A prohibitory injunction is one that forbids or restrains an act. . . .  A mandatory injunction, in contrast, orders an affirmative act or mandates a specified course of conduct . . . .

Id. (citation omitted); see also Mastrovincenzo v. City of New York, 435 F.3d 78, 89 (2d Cir. 2006) (mandatory injunction "is said to alter the status quo by commanding some positive act" (citation omitted)).  "Because in borderline cases injunctive provisions containing essentially the same command can be phrased either in mandatory or prohibitory terms," the Second

---

[6] The "heightened substantial likelihood standard may also be required when the requested injunction (1) would provide the plaintiff with all the relief that is sought and (2) could not be undone by a judgment favorable to defendants on the merits at trial."  Mastrovincenzo v. City of New York, 435 F.3d 78, 90 (2d Cir. 2006) (citation omitted).  The parties have not argued that the proposed preliminary injunction would grant such relief so as to trigger the heightened standard on this ground.

Circuit has, "on exceptional occasions, looked beyond the terms of the injunction itself." Mastrovincenzo, 435 F.3d at 90 (finding that the court "need not look beyond the terms of the injunction" however, where the injunction "does not command the [defendant] to perform any specific tasks"). The Second Circuit has rejected the proposition "that an injunction that is prohibitory in form and that promises no severe or irreversible changes to the status quo may be recast as, or transformed into, a mandatory injunction simply by a reference to the predictability and certainty of the action enjoined." Id.

In contract cases, "[c]onfusion . . . as to whether an injunction is mandatory or prohibitory may stem from the meaning of 'status quo.'" Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc., 60 F.3d 27, 34 (2d Cir. 1995). This is because "[a] plaintiff's view of the status quo is the situation that would prevail if its version of the contract were performed," whereas "[a] defendant's view of the status quo is its continued failure to perform as the plaintiff desires," and thus "[t]o a breach of contract defendant, any injunction requiring performance may seem mandatory." Id. In Tom Doherty Assocs., the court found a provision of the preliminary injunction ordering defendant to license a book to plaintiff "arguably mandatory" because it "arguably alter[ed] the status quo by doing more than is required by the [contract at issue]."

Id. at 35; see also SEC v. Cavanagh, 155 F.3d 129, 136 (2d Cir. 1998) (distinguishing affirmative required by injunction in Tom Doherty Assocs. with provision in injunction that froze the proceeds of a certain stock sale for possible disgorgement because such a provision "merely freezes the status quo").

The requested injunction seeks to enjoin the distribution of certain sales proceeds until a final determination on the merits can be made. The injunction requires defendants to undertake no affirmative act, and therefore is prohibitory in nature. Wells Fargo's reference to the "predictability and certainty" of such distributions is not sufficient to recast the injunction in a mandatory light, and therefore the ordinary standard for prohibitory injunctions will be applied.

A.   Irreparable Harm

"The showing of irreparable harm is perhaps the single most important prerequisite for the issuance of a preliminary injunction." Kamerling v. Massanari, 295 F.3d 206, 214 (2d Cir. 2002) (citation omitted). "[A]ccordingly, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." Grand River Enterprise Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007) (citation omitted). Irreparable harm is found where, "but for the grant of equitable relief,

there is a substantial chance that upon final resolution of the
action the parties cannot be returned to the positions they
previously occupied." Brenntag Int'l Chems., Inc. v. Bank of
India, 175 F.3d 245, 249 (2d Cir. 1999). Irreparable harm must
be shown to be "actual and imminent, not remote or speculative."
Kamerling, 295 F.3d at 214. The "mere possibility of
irreparable harm is insufficient to justify the drastic remedy
of a preliminary injunction." Borey v. National Union Fire Ins.
Co., 934 F.2d 30, 34 (2d Cir. 1991).

To establish irreparable harm, a party must show that
"there is a continuing harm which cannot be adequately redressed
by final relief on the merits and for which money damages cannot
provide adequate compensation." Kamerling, 295 F.3d at 214
(citation omitted). Proof of a monetary loss will ordinarily
not suffice. The movant must show "evidence of damage that
cannot be rectified by financial compensation." Tucker Anthony
Realty Corp. v. Schlesinger, 888 F.2d 969, 975 (2d Cir. 1989).
Because irreparable harm is shown, however, where "there is a
substantial chance that upon final resolution of the action the
parties cannot be returned to the positions they previously
occupied . . . courts have excepted from the general rule
regarding monetary injury situations involving obligations owed
by insolvents." Brenntag Int'l Chems., Inc., 145 F.3d at 249-
50. In response to the defendant's argument that there was no

18

irreparable harm because there were other defendants plaintiff
could look to besides one defendant who was insolvent, the court
in Brenntag Int'l Chems., Inc. "recognize[d] the danger in
finding irreparable harm where alternative, solvent defendants
are available," but upheld the injunction in that case because
the claims against the insolvent defendant were "far simpler and
much stronger" than the claims against the other two solvent
defendants.  Id. at 250.

     Whether Rabobank has demonstrated irreparable harm from the
absence of injunctive relief is not an easily resolved question.
Were this Court to accept Rabobank's interpretation of the
relevant documents, i.e., that a sale of an asset pursuant to
Section 12.1 constitutes a liquidation that entitles Rabobank to
a termination payment and that proceeds from such a sale may not
be distributed, Rabobank has demonstrated the possibility of
irreparable harm.  Rabobank contends that it is entitled to
almost $10 million as a termination payment and that Brookville
has assets worth roughly $30 million.  Rabobank speculates that
the new Collateral Manager has wrongfully sold or will
wrongfully sell off all of Brookville's assets by improperly
designating them as defaulted or credit risk securities eligible
for sale under Section 12.1 of the Terms Supplement to the
Indenture, and that the proceeds of those sales will be
distributed on December 10 according to the waterfall protocols

and Brookville's coffers thereby emptied, rendering Brookville
unable to make the termination payment to Rabobank.  (This
argument, of course, requires Rabobank to show that it is likely
that the Collateral Manager will breach its contractual duties,
and Rabobank has failed to do so.)  Rabobank contends further
that even proper sales under Section 12.1 trigger its rights to
the termination payment.  It is a closer question whether
Rabobank has made a sufficient showing that sales of properly
designated assets pursuant to Section 12.1 will render
Brookville unable to pay any termination payment that Rabobank
may be owed if it ultimately prevails on the merits.

Rabobank relies on Republic of Philippines v. Marcos, 806
F.2d 344, 356 (2d Cir. 1986), to argue that a risk that
defendants will dissipate assets and frustrate final relief
supports a finding of irreparable harm.  The facts in Marcos,
however, are wholly distinguishable from the situation in the
instant case.  There, the Republic of Philippines was attempting
to recover assets of its former President, Ferdinand Marcos, and
his family that had been allegedly acquired with funds that were
the property of the Philippine government and people.  Id. at
347-48.  The Republic of the Philippines brought suit claiming
that certain defendants had conspired to purchase several pieces
of property in New York for the Marcos, and that the Marcos were
trying to sell these properties, possibly to purchasers in good

faith.  Id. at 348-49.  The court upheld the grant of a
preliminary injunction "to prevent any transfer or encumbrance
of the properties that would place them beyond The Republic's
reach or would prevent reconveyance of the properties to the
Republic."  Id. at 356.  The actions of the defendants in
Marcos, thus, presented clear evidence of bad faith efforts to
frustrate the entry of final judgment, such that there was a
"substantial chance that upon final resolution of the action the
parties cannot be returned to the positions they previously
occupied."  Brenntag Int'l Chems., Inc., 175 F.3d at 249.

     Likewise, in Quantum Corporate Funding, Ltd. v. Assist You
Home Health Care Servs. of VA., 144 F.Supp.2d 241 (S.D.N.Y.
2001), also cited by Rabobank, the court found irreparable harm
in a circumstance where the defendant debtor had failed to pay
the creditors of a previous company it owned, had closed down
that previous company leaving many judgments against it
unsatisfied, and was "evasive" and "not credible" when asked
about the finances of the current company, leading the court to
conclude that defendant had a "history of making judgments
uncollectible."  Id. at 245-46.  There is no analogue here to
the scheming described in Quantum Corporate Funding.
Nonetheless, it will be assumed for purposes of this discussion
that Rabobank has succeeded in showing a likelihood of

irreparable harm.  The resolution of this motion, therefore,
will turn on the examination of the merits of its claims.


B.  Likelihood of Success on the Merits

     Rabobank's application for preliminary relief must
principally be denied for its failure to show a likelihood of
success on the merits.  As discussed above, Rabobank and Wells
Fargo have proffered conflicting interpretations of the key
terms of the relevant agreements.  Rabobank claims that a
"liquidation" triggering its right to terminate the Hedge
Agreement under Section 5(e)(ii)(1) of the Schedule to the Hedge
Agreement has occurred.  It further contends that under Section
5.5(a) of the Terms Supplement, Wells Fargo must cease
distributing payments from the sales of Brookville's assets
until Rabobank can terminate the Hedge Agreement.  In
opposition, Wells Fargo contends that no such "liquidation" has
occurred, and thus that Rabobank does not have the right to
terminate the agreement, nor may Wells Fargo delay making the
monthly distribution of proceeds or retain the funds from sales
of assets.

     "In interpreting a contract, the intent of the parties
governs.  A contract should be construed so as to give full
meaning and effect to all of its provisions."  Chapman v. New
York State Div. for Youth, 546 F.3d 230, 236 (2d Cir. 2008)

(citation omitted); see also Postlewaite v. McGraw-Hill, Inc.,
411 F.3d 63, 67 (2d Cir. 2005).  "An interpretation of a
contract that has the effect of rendering at least one clause
superfluous or meaningless is not preferred and will be avoided
if possible."  LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital
Corp., 424 F.3d 195, 206 (2d Cir. 2005) (citation omitted).
When a transaction involves multiple writings that "form part of
a single transaction and are designed to effectuate the same
purpose, [they] must be read together, even though they were
executed on different dates and were not all between the same
parties."  TVT Records v. Island Def Jam Music Group, 412 F.3d
82, 89 (2d Cir. 2005) (citation omitted).

     In ascertaining the purpose or intent of the parties, "lest
form swallow substance, [the] goal must be to accord the words
of the contract their fair and reasonable meaning."  Sutton v.
East River Sav. Bank, 55 N.Y.2d 550, 555 (N.Y. 1982) (citation
omitted).  If the contract "makes clear the parties' over-all
intention, courts examining isolated provisions should then
choose that construction which will carry out the plain purpose
and object of the [agreement]."  Kass v. Kass, 91 N.Y.2d 554,
567 (N.Y. 1998) (citation omitted).

     "The question of whether a provision in an agreement is
ambiguous is a question of law," and "[u]nder New York law, the
presence or absence of ambiguity is determined by looking within

the four corners of the document, without reference to extrinsic evidence." Chapman, 546 F.3d at 236; see also Postlewaite, 411 F.3d at 67 ("[I]f a contract is straightforward and unambiguous, its interpretation presents a question of law for the court to be made without resort to extrinsic evidence." (citation omitted)). Unambiguous contract terms "are given their plain meaning." Krumme v. West Point Stevens, Inc., 238 F.3d 133, 139 (2d Cir. 2000) (citation omitted).

> [A]n ambiguity exists where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

Chapman, 546 F.3d at 236 (citation omitted); see also Krumme, 238 F.3d at 139.  "The language of a contract is not made ambiguous simply because the parties urge different interpretations." Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992).  In determining whether a contractual term is ambiguous, courts are to consider "the entire contract to safeguard against adopting an interpretation that would render any individual provision superfluous." RJE Corp. v. Northville Indus. Corp., 329 F.3d 310, 314 (2d Cir. 2003) (citation omitted).

1.  <u>Has There Been an Additional Termination Event?</u>

Rabobank argues that there has already been a liquidation of the collateral, as that event is defined under Section 5(e)(ii)(1) of the Schedule to the Hedge Agreement.  It is undisputed that, at least under the circumstances at issue here, it may not terminate the Hedge Agreement and receive its coveted termination payment in the absence of a "liquidation" of the collateral.  Rabobank, however, has failed to show a likelihood of prevailing on this point at trial.  Under the unambiguous terms of the Indenture, as contained in Section 5.5(a) of the Terms Supplement, no liquidation has yet occurred.

Section 5.5(a) of the Terms Supplement lists three predicates for the "liquidation" of the collateral.  It requires an Event of Default, a declaration that the Notes are immediately due and payable, and the occurrence of at least one of three additional events.  It is undisputed that the Event of Default and notification of the acceleration of the Notes occurred in February and March of 2008.  As significantly, it is also undisputed that none of the three additional triggering events described in Section 5.5(a) has yet occurred.  The additional events are principally votes by defined classes of noteholders directing the sale and liquidation of the collateral.

In the absence of these three predicate events for a liquidation, Section 5.5(a) commands that Wells Fargo as Trustee shall "retain the Collateral . . . intact" and "make and apply" all monthly payments in accordance with the waterfall provisions.  The same provision directs that the Trustee "shall not terminate any Hedge Agreement."  (Emphasis supplied.)

Rabobank argues that a liquidation in fact occurred with the sale of collateral in August 2008.  To make this argument it essentially ignores Section 5.5(a) of the Terms Supplement and points to Section 5(e)(ii)(1) of the Schedule to the Hedge Agreement.  That latter provision explains that an "Additional Termination Event" permitting termination of the Hedge Agreement exists on the occurrence of "an Event of Default under the Indenture followed by the acceleration of the Notes and the liquidation of any or all of the collateral."  (Emphasis supplied.)  Rabobank argues that a sale of assets pursuant to Section 12.1 of the Terms Supplement constitutes a "liquidation" under Section 5(e)(ii)(1) of the Schedule.

The parties agree that the Hedge Agreement and Indenture were executed as part of a single transaction and should be read together.  Reading these two provisions in the Terms Supplement and the Schedule together therefore, to give full meaning to both provisions, the term "liquidation" in the Schedule should be understood to incorporate the definition given to that term

26

in Section 5.5(a) of the Terms Supplement and to require that
each of the three predicate events for a liquidation occurs
before this additional termination event exists.

Reading the phrase "liquidation of any or all of the
collateral" in Section 5(e) of the Schedule to the Hedge
Agreement to mean any sale of Brookville's assets, such as those
sales accomplished pursuant to Section 12.1 of the Terms
Supplement, proves too much.  If any asset sale under Section
12.1 is a "liquidation" of collateral sufficient to trigger
Rabobank's termination rights and the obligation to hold the
proceeds of the collateral, it would gut the carefully spelled
out predicates for a liquidation under Section 5.5(a) and
exponentially expand Rabobank's termination rights.  The use of
the term "liquidation" in Section 5(e) was not a casual
reference; these agreements were executed on the same day as
part of the same transaction and as such must be read together
to effectuate the agreement as a whole and give meaning to each
of its provisions.

Because liquidation is an event specifically described in
Section 5.5(a) of the Terms Supplement, it is that section that
must govern whether a liquidation triggering Rabobank's
termination rights has occurred.  Rabobank's contention that the
word "liquidation" in Section 5(e)(ii)(1) of the Schedule should
be given a meaning found in a dictionary definition of the word,

cannot overcome the fact that the meaning of the word for these parties in this context is set out clearly in the Terms Supplement.  Additionally, if resort to dictionary definitions were necessary to resolve this dispute, then Wells Fargo has pointed to definitions that favor its reading of the term "liquidation."

It is true, as Rabobank has argued, that the word "liquidation" is used in some of the other provisions in these documents to refer to asset sales under Section 12.1.  For example, Section 10.2(k) of the Indenture provides that certain collateral debt securities and other assets "shall not be liquidated except in accordance with Section 12.1 hereof." Additionally, Section 12.1(b) of the Indenture states that certain procedures are to be followed in selling assets "[u]nless the Terms Supplement provides that an alternative liquidation procedure be followed."  Similarly, Section 12.1(c)(iv) of the Indenture refers to the procedure for liquidation of a synthetic security.  These provisions, however, do not necessarily imply, as Rabobank contends, that the word "liquidation" as used in Section 5(e)(ii)(1) must mean a sale of assets under 12.1 of the Terms Supplement.  Rather, these provisions merely suggest that the word "liquidation" as used in these documents has multiple meanings, and that one must look to

the context of the provision in question to determine that meaning.

It is clear from the context of the word "liquidation" in Section 5(e)(ii)(1) that it is referring not to a sale of assets under Section 12.1 of the Terms Supplement, but to a formal liquidation pursuant to Section 5.5(a) of the Terms Supplement. Section 5(e)(ii)(1), in describing an additional termination event, sets forth a condition for the end of the business relationship between Rabobank and Brookville; likewise, Section 5.5(a)'s provisions for a liquidation describe the winding down of the CDO, and the provisions are naturally read together.

Had the parties intended that any asset sale pursuant to Section 12.1 following an event of default and acceleration of the Notes would have the drastic effect of triggering Rabobank's termination right, they would not have buried that consequence opaquely within Section 5(e) through an implied meaning for the word "liquidation," but would have made that intention express. These are carefully structured documents with intricately interwoven and balanced duties and rights.  They spell out the parties' obligations in exquisite detail.  They exert minute control over the Collateral Manager and the Trustee.  The participation of a Hedge Counterparty in the enterprise is a material component of its business and the termination of that participation was a matter of consequence to all parties.

Rabobank has failed to show that there is any likelihood that it will succeed at trial in proving that a sale of collateral under Section 12.1 constitutes a liquidation under Section 5(e)(ii)(1), or even that a fair ground for litigation exists on this point.

Rabobank also argues that the use of the words "any or all" in Section 5(e)(ii)(1) of the Schedule to the Hedge Agreement implies that this Additional Termination Event provision was not intended to apply only to a Section 5.5(a) liquidation, which entails a liquidation of the entire collateral.  The more natural reading of this "any or all" language, however, is that it simply demonstrates the fact that the termination event has occurred once the liquidation of collateral begins, i.e., once "any" of the collateral has begun to be liquidated.  This timing point is made clear in the very next sentence of Section 5(e)(ii)(1), which provides that the Additional Termination Event occurs on the date the liquidation of the collateral commences.

Finally, Rabobank argues in favor of its interpretation of the word "liquidation" in Section 5(e) of the Schedule to the Hedge Agreement, as well as for its interpretation of Section 5.5(a) discussed in the following section, by arguing that these provisions are there to protect Rabobank's payment priority and interests.  The agreements at issue in this dispute, however,

are complex agreements effectuating complex transactions -- the
best way to protect all of the parties' carefully negotiated
rights is to give the terms in these agreements their clear and
unambiguous meaning in the context of the transaction as a
whole.   Thus, there being no dispute that the conditions for a
liquidation as spelled out in Section 5.5(a) of the Terms
Supplement have not yet occurred, Rabobank has failed to show
that a liquidation as that term is used in Section 5.5(e)(ii)(1)
of the Schedule to the Hedge Agreement has occurred, and that
its right to terminate the Hedge Agreement has been triggered.


        2. May Wells Fargo Distribute the Proceeds from Section
12.1 Sales?

        Rabobank's second contention is that under Section 5.5(a)
of the Terms Supplement, Wells Fargo may not distribute the
proceeds from any liquidation or sale of collateral (including
Section 12.1 sales) until Rabobank has had the opportunity to
terminate the Hedge Agreement.   As set forth above, Section
5.5(a) sets out the conditions for directing a liquidation of
the collateral, and then provides the following two sentences:

> If any one of the applicable conditions above to
> the liquidation of the Collateral is satisfied, the
> Trustee will liquidate the Collateral and, on the
> sixth Business Day (the "Accelerated Maturity Date")
> following the Business Day (which shall be the
> Determination Date for such Accelerated Maturity
> Date) on which the Trustee notifies the Issuer, the

> Collateral Manager, each Hedge Counterparty and each
> Rating Agency <u>that such liquidation has been
> completed</u>, <u>apply the proceeds of such liquidation in
> accordance with the Liquidation Waterfall.
> Notwithstanding the foregoing, in no event shall any
> application of the proceeds of any sale or
> liquidation of the Collateral following an Event of
> Default occur prior to the earlier of (x) the sixth
> Business Day after the date on which any of the
> conditions set forth above is satisfied and (y) the
> date on which amounts (if any) payable by the Issuer
> to any Hedge Counterparty [Rabobank] due to an "Early
> Termination Event" (as defined in the relevant Hedge
> Agreement) become due and payable</u>.

Section 5.5(a) (Emphasis added).  The parties dispute the

application of the second sentence in this paragraph (the

"Timing Paragraph"), with Wells Fargo contending that it applies

only to proceeds from a Section 5.5(a) liquidation, and Rabobank

contending that "any sale or liquidation" applies to sales and

liquidations pursuant to other provisions, including Section

12.1.

Rabobank has not shown a likelihood of success on the

merits or even a fair ground for litigation on this point.  The

sentence at issue is contained in a long provision, Section

5.5(a), the purpose of which is to define the conditions for a

liquidation of the collateral.  The natural reading of this

final sentence in Section 5.5(a) is that it sets forth certain

conditions regarding the timing of the payment of proceeds of

such a liquidation under Section 5.5(a).  Rabobank's attempt to

divorce this second sentence from the context and structure of

32

Section 5.5(a), by claiming that it is meant to apply to all sales of assets, including those pursuant to Section 12.1 of the Terms Supplement, finds no support in the structure or purpose of this provision.

Rabobank contends that because the first sentence in this Timing Paragraph states that distributions from the liquidation are to be applied on the sixth business day after the business day on which the Trustee notifies the parties that the liquidation has been "completed," an interpretation that the second sentence only applies to a liquidation under Section 5.5(a) renders the second sentence a nullity, because the second sentence provides that no proceeds from any sale or liquidation can be applied any earlier than, inter alia, six business days after the liquidation commences.  These two sentences are not, however, in contradiction.  The first sentence provides that after the completion of a liquidation, all the proceeds must be distributed no later than the sixth business day after notice of the completion.  The second sentence provides a window for Rabobank to terminate the Hedge Agreement before the start of any application of the proceeds of a liquidation, by providing that no application of the proceeds of a liquidation can occur before the earlier of (1) six days after any of the conditions for directing a liquidation have been satisfied, or (2) the day Rabobank's termination payment is payable due to its exercise of

its right to terminate the Hedge Agreement following a liquidation.  That latter event can be as early as one day after the Trustee notifies Rabobank of the liquidation.  In other words, these two sentences, read together to give effect to all provisions, provide that no payment of any liquidation proceeds can occur before the earlier of either six days after the liquidation vote or the date Rabobank's termination payment is due and payable and that any final payment of the proceeds of the liquidation must be made within six days of notice of the liquidation's completion.

There is perhaps some tension in reading these two sentences in the Timing Paragraph to allow for distributions of the liquidation proceeds before the liquidation is completed, given the instruction in the first paragraph of Section 5.5(a) which states that distributions in the ordinary course are to be made "unless" the conditions for directing a liquidation have been met.  There does not appear to be an explicit bar on such distributions, however, and more importantly, Rabobank's interpretation of the final sentence in Section 5.5(a) as being untethered from a Section 5.5(a) liquidation would do an even greater disservice towards reading these documents together in accordance with the intent of the parties and the clear meaning of the terms.

Under Rabobank's interpretation of the last sentence of Section 5.5(a), no application of any proceeds of any asset sale, including sales pursuant to Section 12.1, could be made after an Event of Default until the earlier of one of two things: either the conditions for directing a liquidation have been satisfied or Rabobank's termination payment is due. Rabobank's reading would mean that if any sales are made pursuant to Section 12.1 after an Event of Default, the application of proceeds from those sales could be prevented indefinitely, so long as no liquidation vote occurred and Rabobank did not declare its termination payment due and payable.  There is no indication that the parties intended such a result; rather, reading the documents as a whole to give effect to all provisions, the last sentence of Section 5.5(a) must be read to refer to the application of proceeds following a liquidation and may not be read to apply to the application of proceeds following sales under Section 12.1 that occur after an Event of Default.  As such, Rabobank has not demonstrated a likelihood of success on the merits or a fair ground for litigation for its contention that Wells Fargo is obligated to hold the proceeds of any sale of collateral, including sales pursuant to Section 12.1, until Rabobank terminates (or has the opportunity to terminate) the Hedge Agreement.

C.  Balance of Hardships

     Finally, Rabobank argues that even if it has not
demonstrated a likelihood of success on the merits, a
preliminary injunction should issue because it has shown
sufficiently serious questions going to the merits to make them
a fair a ground for litigation, and that the balance of
hardships tips in its favor.  Rabobank's principal argument on
this point is that the "balance of hardships tips decidedly in
favor" of a plaintiff facing "dissipation of an important asset,
leaving little for [it] to recapture if it should eventually
succeed in [its] lawsuit."  Int'l Controls Corp. v. Vesco, 490
F.2d 1334, 1347 (2d Cir. 1974).

     Because Rabobank has failed to show that there are
sufficiently serious questions on the merits, it is unnecessary
to grapple at length with this alternative ground for an
injunction.  Nevertheless, it is worth observing that, although
Rabobank contends that no other party faces any substantial
hardship in connection with the preliminary relief sought, in
this contractual interpretation dispute, as in most such cases,
there are hardships on both sides.  While Rabobank asserts that
it faces hardship if the distribution on December 10 of the
proceeds from the sale of assets is allowed to go forward, an
injunction preventing that distribution would cause hardship to,
inter alia, the noteholders by delaying their receipt of the

proceeds from those sales until a final decision on the merits.
Additionally, should a preliminary injunction issue, Wells Fargo
would have to ascertain not just where to keep these proceeds
pending a final resolution on the merits, but also would have to
keep track of who in fact is owed these funds, given that the
identities of the noteholders may change during the pendency of
the litigation.  In making these determinations, the Trustee
would be acting without explicit directions from the Indenture.
It is easy to predict that further litigation may ensue in such
circumstances, with its attendant costs born by the CDO and all
parties.


CONCLUSION

        Rabobank's November 13, 2008 motion for a preliminary
injunction is denied.


        SO ORDERED:

Dated:    New York, New York
          December 10, 2008

                              _____
                                    DENISE COTE
                              United States District Judge


37